IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID BENTON DORSEY and | ) | |
| KARMEN M. DORSEY, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-1026-MEF |
| | ) | [WO – Do Not Publish] |
| SUSAN S. DEPAOLA, as Chapter 7 | ) | |
| Trustee, | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

This bankruptcy appeal by Chapter 7 Debtor David Benton Dorsey ("Dorsey") and

his non-debtor wife Karmen M. Dorsey ("Karmen") raises three issues: (1) the propriety of

the Bankruptcy Court's denial of discharge to Dorsey, pursuant to 11 U.S.C. §§ 727(a)(2),

(a)(3), and (a)(4); (2) the propriety of the Bankruptcy Court's conclusion that three transfers

of real property to Karmen were fraudulent and, thus, avoidable under § 544(b); and (3)

whether the Bankruptcy Court erred in concluding that Karmen was not entitled to a credit

for value given under *Ala. Code* 8-9A-8(d).  The bankruptcy court is due to be **AFFIRMED**.


## I.  JURISDICTION

This is a core proceeding over which appellate jurisdiction is exercised.  *See* 28 U.S.C.

§ 158(a) (granting district courts jurisdiction to hear appeals "from final judgments, orders,

and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the

bankruptcy judges under section 157 of this title"); § 157(b)(2)(I).  Venue is proper because an appeal "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."  *Id.*

## II.  STANDARD OF REVIEW

"Factual findings by the bankruptcy court are reviewed under the limited and deferential clearly erroneous standard."  *In re Club Assocs.*, 951 F.2d 1223, 1228 (11th Cir. 1992); *see also In re Jet Fla. Sys., Inc.*, 861 F.2d 1555, 1558 (11th Cir. 1988) ("When the district court has affirmed the bankruptcy court's findings . . . we will apply the clearly erroneous doctrine with particular rigor.").  The district court examines the bankruptcy court's legal conclusions *de novo*.  *In re Celotex Corp.*, 613 F.3d 1318, 1322 (11th Cir. 2010); *see also* Fed. R. Bankr. P. 8013.

## III.  DISCUSSION

### A.  Denial of Discharge and Fraudulent Transfers (Issues I and II)

The Bankruptcy Court entered a through and well-reasoned thirty page opinion on June 8, 2011.  (Mem. Op. (Doc. # 3-44).)  In that opinion, the Bankruptcy Court made factual findings and credibility determinations after a bench trial, and based upon those factual findings, concluded that a denial of discharge to Dorsey was appropriate under §§ 727(a)(2), (3), and (4).  The Bankruptcy Court also concluded that Dorsey's three property transfers to his wife, Karmen, were done with the actual intent to hinder, delay, and defraud his creditors under *Ala. Code* § 8-9A-4.  At the same time, the Bankruptcy Court concluded that constructive fraud was present as well for these transfers, *Ala. Code* § 8-9A-5.  Given these

findings, the Court decided that the transfers were subject to the Trustee's avoidance power under 11 U.S.C. § 544(b).

Having reviewed the Bankruptcy Court's factual findings for clear error and legal conclusions *de novo*, this Court concludes that nothing need be added to the Bankruptcy Court's opinion.  Accordingly, this Court adopts the opinion as its own, and attaches it as Exhibit A to this Order.

**B.   <u>Karmen's Credit (Issue III)</u>**

The Bankruptcy Court addressed the issue of whether Karmen was entitled to a credit for value given under *Ala. Code* 8-9A-8(d) in a subsequent order.  (Doc. # 3-48, at 4-8.)  Section 8-9A-8(d) states:

> Notwithstanding the voidability of a transfer under this chapter, a *good-faith transferee* is entitled, to the extent of the value given the debtor for the transfer or to another person as *a consequence of the debtor's making such transfer*, to (1) A lien on or a right to retain any interest in the asset transferred; or (2) a reduction in the amount of the liability on the judgment.

*Id.* (emphasis added).

The Bankruptcy Court first determined that Karmen was not a "good-faith transferee" for purposes of § 8-9A-8(d).  The Alabama Supreme Court has indicated that it is proper to look to other jurisdictions' interpretations of the Uniform Fraudulent Transfer Act ("UFTA") in construing Alabama's version.  *Horton v. Alexander*, 977 So. 2d 462, 465 (Ala. 2007).  The Bankruptcy Court cited a Northern District of Georgia bankruptcy case construing Georgia's UFTA, wherein that court stated:

> The good faith of a transferee is determined through an objective consideration of what that transferee knew or should have known . . . .  Circumstances that would place a reasonable person on inquiry of a debtor's fraudulent purpose, or that show a diligent inquiry would have discovered the fraudulent purpose objectively prove a lack of good faith . . . .  Good faith requires not just a lack of actual knowledge of fraud, but also a lack of knowledge of circumstances requiring further investigation.

*In re Christou*, Bankr. Nos. 06-68251MHM & 06-68376MHM, 2010 WL 4008167, at *3 (Bankr. N.D. Ga. Sept. 24, 2010) (citations omitted).  In addition, many courts have concluded that the UFTA good faith standard is identical to that in § 548(c) of the Bankruptcy Code.  *See Herup v. First Boston Fin., LLC*, 162 P.2d 870, 874 n.15 (Nev. 2007) (collecting cases).  That standard is almost identical to the one used by the Bankruptcy Court in this case.  *See, e.g., In re World Vision Entm't, Inc.*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002).

Given the factual circumstances, reviewed for clear error, found to exist by the Bankruptcy Court concerning Karmen's level of knowledge of Dorsey's business affairs, including the impending or pending Tommy Andrews lawsuit, this Court is not in a position to disagree with the Bankruptcy Court's finding that Karmen was not a good-faith transferee within the meaning of § 8-9A-8(d).

The Bankruptcy Court also determined that, even if Karmen was a good-faith transferee, she nevertheless would not qualify for a credit under § 8-9A-8(d) because she failed to prove that the payment was "'as a consequence of the debtor's making such transfer.'"  (Doc. # 3-48, at 6 (quoting *Ala. Code* § 8-9A-8(d).)  This is a factual question reviewed for clear error.  The Bankruptcy Court emphasized:  (1) that Karmen was obligated

to pay the mortgage irrespective of the transfer; and (2) that the payment was made thirteen months after the transfer from Dorsey.  It was not clear error for the Bankruptcy Court to have concluded that Karmen's mortgage payment was not a consequence of Dorsey's transfer of the property to her.

## IV.  CONCLUSION

For the foregoing reasons, it is ORDERED that the bankruptcy court is AFFIRMED. The Clerk of the Court is DIRECTED to terminate this appeal and close this case number. The case is REFERRED back to the Bankruptcy Court.

DONE this 31st day of May, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

In re                                                    CASE NO. 09-11157-WRS
                                                         CHAPTER 7

DAVID BENTON DORSEY,

        **DEBTOR**

SUSAN S. DEPAOLA, Chapter 7 Trustee,

        **Plaintiff**

v.                                                       Adv. Proc. No. 10-1006-WRS

DAVID BENTON DORSEY and
KARMEN M. DORSEY,

        **Defendants**


### <u>MEMORANDUM DECISION</u>

This Adversary Proceeding came before the Court for trial on February 2-3, 2011. At the

conclusion of the trial, the Court requested Proposed Findings of Fact and Conclusions of Law

from the parties, which have been filed. (Docs. 39, 40). For the reasons set forth below,

judgment is entered in favor of Plaintiff Susan S. DePaola and against Defendants David Benton

Dorsey and Karmen M. Dorsey. Defendant David M. Dorsey, the Debtor in the underlying

Chapter 7 bankruptcy case is denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2), (3) and (4).

In addition, the transfers of three parcels of real property are avoided pursuant to 11 U.S.C. §

544(b) and Alabama Code §§ 8-9A-4 and 8-9A-5. The Court will further order a sale of the joint

property pursuant to 11 U.S.C. § 363(h), with the proceeds to be apportioned as set forth herein.

The Court will retain jurisdiction over this matter to supervise the sale of the property and the

further administration of the estate.

1

# I. FACTS

The Court will divide its discussion of the facts of this case into two parts.  In Part I(A), the Court will discuss the proceedings which took place during the pendency of the Debtor's Chapter 7 bankruptcy case.  In Part I(B), the Court will discuss transfers of Dorsey's interest in three separate parcels of real property to his wife, co-defendant Karmen Dorsey.

## A.  The Bankruptcy Proceedings

### 1.  General

On June 12, 2009, David Benson Dorsey (Dorsey) filed a petition in bankruptcy pursuant to Chapter 7 of the Bankruptcy Code.  (Case No. 09-11157, Doc. 1).[1]  At that time, Dorsey filed a full set of the required statements and schedules, including Schedule B (personal property); Schedule D (creditors holding secured claims); and a Statement of Financial Affairs.  Dorsey is and has, for many years, been married to co-defendant Karmen Dorsey (Karmen), however, Karmen did not join in filing the petition in bankruptcy and is not a debtor.  On January 20, 2010, Chapter 7 Trustee Susan S. DePaola (DePaola) filed a timely complaint to deny Dorsey a discharge and to avoid fraudulent transfers of real property by Dorsey to his wife.  DePaola amended her complaint on June 17, 2010.  (Doc. 24).

Dorsey is 48 years old and a graduate of Troy State University.  He has been involved in various trucking business most of his adult life and is knowledgeable about business matters, particularly the financing and leasing of semi-trucks and trailers and the trucking business.  He has been married to co-defendant Karmen Dorsey for 20 years and they have three children.

---

[1]  References to documents in the main bankruptcy case file will be preceded by the case number.  References to documents filed in this Adversary Proceeding will be to the docket number alone.

2

Dorsey and Karmen reside in Dothan, Alabama, having lived there since the year 2000. Dorsey and Karmen have resided together their entire married life and have never separated or filed for divorce. Karmen has a college degree, also from Troy State University and is a school teacher. After the Dorsey's first child was born in 1993, Karmen quit teaching school and stayed home to raise the children. Karmen began working, again as a school teacher, in August of 2009 as a result of financial difficulties resulting from Dorsey's business failure. Karmen was not employed outside the home between 1993 and August of 2009. (Tr. 304-07).[2] Karmen is not sophisticated in business affairs and did not appear to be familiar with the details of Dorsey's business. She had, at best, only a general or overall familiarity with Dorsey's business affairs.

## 2. The Boat

Dorsey filed Schedules and Statements with his bankruptcy petition. (Pl. Ex. 1) (09-11157, Doc. 1). In Schedule B, Dorsey listed a boat, which he valued at $6,000. Schedule B calls for the Debtor to disclose the location of the property, but he failed to do so. On Schedule D, Dorsey represented that an individual named Teddy Vaughan held a security interest in the boat, which secured an indebtedness of $12,000. Thus, Dorsey disclosed ownership of a boat but claimed that it was subject to a security interest in favor of Teddy Vaughan, a lifelong friend of Dorsey.

Dorsey gave testimony at a meeting of creditors conducted by chapter 7 Trustee Daniel Hamm (Hamm) on September 3, 2009. (Pl. Ex. 40). In response to Hamm's inquires, Dorsey

---

[2] References to the trial transcript shall be as follows: Tr. __. The trial took place on February 2 and 3, 2011, however, the pages of the transcript are numbered sequentially so it is not necessary to designate the date when citing to the trial transcript.

testified under oath that there was a lien against the boat.  (Pl. Ex. 40, p. 16).  The following

exchange took place between Trustee Hamm and Dorsey's lawyer Matt Brunson.

> Hamm: Mr. Brunson, do you know if anything has been filed with
> the Alabama Secretary of State on that?
>
> Brunson: It was my understanding that there is a UCC filed on it.
>
> Mr. Hamm: Okay.  Can you get me a copy of the UCC-1?
>
> Brunson: Okay.

(Pl. Ex. 40, pp. 16-17).

Susan DePaola was later substituted as Chapter 7 Trustee in place of Hamm and a second

meeting of creditors was held on October 9, 2009.  DePaola followed up:

> DePaola: The other thing that was asked about in the last hearing
> was you were going to produce any evidence that Teddy Vaughan
> had security interest in the boat.  Promissory – you were asked for
> the promissory note, or any UCC filing, none of which I see
> online.  Have you all put that together.
>
> Dorsey: There is a copy of the note, I think.  Do we not have that?
> I don't recall.  I know there is a copy of a note somewhere.  We
> can get that for you.
>
> Brunson: I will have to get that for you.  I apologize.

DePaola: Okay.  The note is certainly at issue.  But also whether
there is any protected[3] security interest in this.  Because, otherwise,
the boat has to be surrendered for sale.

(Pl. Ex. 41, pp. 32-33).

On October 12, 2009, DePaola wrote Brunson, stating, in part, as follows:

First, Mr. Hamm had previously requested documents relating to
the boat.  This is a fairly easy issue–either there is or there is not
evidence of secured party status in favor of Teddy Vaughan as it
relates to this boat.  These documents need to be provided or, if
they do not exist, please have the title or original bill of sale along
with the boat, trailer, keys, motor and accessories delivered to your
office and I will arrange pick up for sale.

(Pl. Ex. 39).

DePaola also wrote Brunson again on January 14, 2010, requesting again that Dorsey

either deliver proof that Teddy Vaughan held a security interest in the boat or that the boat be

delivered.  Incredibly, Brunson did not respond and DePaola wrote a third time on March 23,

2010.  On April 7, 2010, Brunson finally responded, promising to deliver the boat.  (Pl. Ex. 39).

Notwithstanding Brunson's promise, Dorsey failed to deliver the boat and the Trustee filed a

motion with the Court.  (09-11157, Doc. 67) (Pl. Ex. 39).  On June 16, 2010, the Court ordered

---

[3]  The transcript of the October 9, 2009 hearing states "protected security interest," yet
DePaola almost certainly actually said "perfected security interest."  Absent evidence of
perfection, the boat would fall prey to the Trustee's avoidance powers.  See, 11 U.S.C. §§ 544-
49.  Without evidence of perfection, Teddy Vaughan would be, at best, only an unsecured
creditor and the Trustee could take the boat and sell it for the benefit of the estate.  Brunson's
statement to the effect that there was a UCC was an effort by him to convince the Trustee to
cease her pursuit of the boat and allow Dorsey the benefit of his fraud.

5

Dorsey to turn the boat over to DePaola. (09-11157, Doc. 73). The boat was sold at auction for only $1,900. (09-111157, Doc. 80). Teddy Vaughan was the high bidder at the auction.

At trial, DePaola inquired as to Dorsey's reasons for withholding the boat.

> Q: On schedule "D" of your petition, Plaintiff's Exhibit 1, page 13, you actually listed Teddy Vaughan as a secured creditor; did you not?
>
> A. Correct.
>
> Q: And you were asked to provide any documents supporting that. Frankly you were asked for eight to ten months to surrender this boat and just simply did not do so. Why is that?
>
> A. Mr. Vaughan was trying to buy the boat from you.
>
> DePaola: Oh, really. I never heard that. So you just thought, despite the fact that I was making repeated demands and had to file a motion for turnover, which is the Plaintiff's Exhibit 39, Your Honor, you thought you could keep it until I decided whether I would sell it to Mr. Vaughan or not?
>
> A. Correct.

(Tr. p. 173). This testimony from Dorsey is patently false. Dorsey knew that the Trustee made repeated demands for the boat over a period of almost 10 months. Dorsey actively concealed the boat from the Trustee and testified falsely at trial. Moreover, Dorsey admitted that the boat had been vandalized while he was withholding it from the Trustee. (Tr. p. 174). The estate was harmed in that the missing items depressed the value of the boat. The most logical inference to be drawn from all of this is that Dorsey removed items from the boat and Teddy Vaughan later purchased the boat at auction, at a depressed price, all to the detriment of the estate.

The Court heard the testimony of Dorsey at trial. Having considered his demeanor the Court finds that Dorsey is not credible and that he willfully misrepresented facts concerning a lien on the boat. The testimony given by Dorsey at the meetings of creditors and the

representations in his schedules were false and known by him to be false. These false statements were made intentionally by Dorsey with the intention to deceive the Trustee Dorsey attempted to defraud the estate by testifying falsely that the boat was encumbered by a security interest in favor of Teddy Vaughan.

What is particularly troubling here is that Matthew Brunson, Dorsey's lawyer falsely stated to Trustee Hamm that he had seen a UCC-1 relating to the boat, when in fact no UCC-1 was ever in existence. Brunson made repeated promises to produce the document, which he claimed that he had seen. When Trustee DePaola followed up, Brunson, together with Dorsey, stonewalled the Trustee. Brunson's statement was particularly harmful here because Brunson should have investigated Dorsey's claim of giving a security interest to a boyhood friend before he listed Vaughan as a secured creditor on Schedule D; a document was filed with the Court under oath. It clearly was both Dorsey and Brunson's intention that the Trustee would rely on this false claim of a security interest so as not to pursue the boat.

### 3.  The Bank Accounts

Dorsey reported on his initial and amended schedules that he only had two checking accounts: one with balance of $2,500 at CB&T and one with Regions Bank with a balance of $150.  (Pl. Ex. 1, p. 9) (Sch. B).  At trial, DePaola produced evidence of bank statements proving the inaccuracy of Dorsey's initial and amended schedules.  First, Dorsey listed only one account with Regions, however he had two: one just in his name, account no. xxx-xxx-667-3 (Regions account 1), (Pl. Ex. 48, p. 413), and a second joint account with his wife, account no. xxx-xxx-692-8, (Regions account 2).  (Pl. Ex. 49, p. 473).  At the time of filing his petition, neither account had a balance of $150.00.  Rather, the statement for Mar. 19, 2009 to June 17, 2009 for

7

Regions account 1 shows a beginning balance of $197.70 and an ending balance of $187.93. There were no deposits or withdrawals, only $0.23 of earned interest. (Pl. Ex. 48, p. 417).

The Regions account 2 does not provide Dorsey any help in explaining his schedules either. On a statement for May 27, 2009 through June 25, 2009, page 3 has a section called "Daily Balance Summary." In that section, it shows that Regions account 2 had a balance of $281.65 on June 12, 2009, the date Dorsey filed his petition. (Pl. Ex. 49, p. 475). At no point was this account even close to $150.00 on the days immediately before or after Dorsey filed his petition.

With regards to the CB&T account, account number xxx-xxx-703-4, the schedules state generally that a CB&T account had a balance of $2,500 on the date of petition. As CB&T account 703-4 is the only one the Trustee has evidence of, the Court assumes this is the account Dorsey disclosed in his schedules. If account number xxx-xxx-703-4 is the account, then Dorsey again misstated his financial affairs. On the last statement for this account prior to filing, dated June 9, 2009 (three days before filing), Dorsey had a balance of $5,793.92. (Pl. Ex. 46, p. 359). On page three on the following months summary, there is also a "Daily Balance Summary" and it shows that on June 12, 2009, the petition date, Dorsey had $3,233.96 in the CB&T account. Id. at 401. While this amount is slightly closer to what Dorsey lists on his initial schedules, it is still significantly greater than the scheduled amount. Moreover, despite the time Dorsey had to amend his schedules (which he did so for his Schedules B and C), he never amended his schedules to accurately reflect the true balance of his account on the date of filing.

The Court finds the omissions and inaccuracies troubling for a variety of reasons. First, in this day in age and with the prevalence of electronic banking, an experience businessman like Dorsey should have been able to determine the current balance of his accounts. Second, even

8

though technology makes accuracy possible, the Court recognizes mistakes happen, but Dorsey never corrected his mistakes, including never adding the third account (Regions account 2).  The Court wonders, if it can figure out Dorsey's three bank accounts and balances as of the date of the petition more than two years later, how come Dorsey could not do it himself?  The Court heard testimony from Dorsey and observed his demeanor at trial.  Considering all relevant evidence, the Court finds that Dorsey willfully misrepresented his bank account information and thereby converted property of the estate.

### 4.  The IRA Account

On Schedule B, Dorsey disclosed that he owned an account with Wachovia Securities which he valued at $75,000.  On Schedule C, Dorsey claimed that account as exempt as an IRA pursuant to 11 U.S.C. § 522(b)(3) and Alabama Code § 19-3-1.  Trustee Hamm requested copies of the IRA statements at the September 3, 2009 meeting of creditors.

> Hamm: Mr. Brunson, I'm going to ask for a statement on those Wachovia securities insofar as the designation of the type of account.  We're going to continue this hearing for that.  But we'll talk about a continue date following–at the end of this.

(Pl. Ex. 40, p. 12).

DePaola took Dorsey's deposition on July 15, 2010, and made inquiry into these matters:

> Q: Tell me specifically what the $200,000 were in stocks, bonds, and retirement account?
>
> A: IRAs–
>
> Q: Tell me specifically, what company–
>
> A.  I can't tell you specifically that.  I mean, can you tell me about yours?

9

(Pl. Ex. 64, pp. 33-34). Dorsey's response to Trustee DePaola's question was wildly inappropriate. DePaola's inquiry into this matter was appropriate and Dorsey was under a duty to answer truthfully, which he did not do. Dorsey did not explain where the money was or provide any documentation, as to either its existence of disposition notwithstanding DePaola's requests, or for that matter, Hamm's earlier requests.

At trial, DePaola again asked Dorsey about the IRA and about the securities.

> Q: Am I correct that at that point, once you had liquidated A.G. Edwards and the Winn-Dixie stock, that the only thing you had left was your IRA?
>
> A: I don't know for sure. You know something I don't. I don't know.
>
> THE COURT: Well, sir, the trustee is trying to get a handle of what property you owned in this time from about 2000 forward. You need to answer as best you can.
>
> A: Okay.
>
> THE COURT: And, you know, when you kind of smart off and say, "you know something I don't," it doesn't help you.

(Tr. pp. 150-51). A few minutes later DePaola broached the subject again after confronting Dorsey with a financial statement disclosing ownership of security accounts.

> Q: And when I found and received the Leaf Funding documents and the Corporate Billing documents that showed that you had two hundred thousand dollars in investments allegedly in April of '08, did I not request documents to demonstrate either the accuracy of the personal financial statement or the disposition of these assets?
>
> A: Maybe my attorney can answer that question, I don't recall the request.

(Tr. p. 176-77). In fact, Dorsey had been asked for statements and documents relating to these securities by Trustee Hamm on September 3, 2009, by Trustee DePaola on October 9, 2009, and

10

again by Trustee DePaola at Dorsey's deposition on July 15, 2010. Dorsey has failed to provide

documentation showing either the disposition of the securities or their existence in a valid IRA

account. Based upon this, the Court concludes that Dorsey has concealed property of the estate

with a value of more than $200,000. Despite repeated requests, Dorsey has not, to this day,

produced the requested statements and has thereby concealed these accounts from the Trustee.

### 5. Dorsey's Business Interests

On the face of a petition in bankruptcy, the debtor must indicate the "nature of debts."

Two check boxes are provided. Notwithstanding the fact that the schedules clearly show that

Dorsey's debts are overwhelmingly business in nature, Dorsey nonetheless checked the

"consumer" box. (09-11157, Doc. 1). This representation is patently false, and was known by

Dorsey to be false at the time he made the statement.

Question No. 18(a) of the Statement of Financial Affairs poses the following question:

> If the debtor is an individual, list the names, addresses, taxpayer
> identification numbers, nature of the business, and beginning and
> ending dates of all business in which the debtor was an officer,
> director, partner, or managing executive of a corporation, a partner
> in a partnership, sole proprietor, or was self-employed in a trade,
> profession, or other activity either full-or part-time within six years
> immediately preceding the commencement of this case, or in
> which the debtor owned 5 percent or more of the voting or equity
> securities within six years immediately preceding the
> commencement of this case.

(09-11157, Doc. 1). In response to this question, Dorsey replied "None." In fact, Dorsey was

employed full time running various trucking businesses in which he owned an interest. At trial,

Dorsey testified at great length about his activities and various business interests, many of which

took place during the six years prior to the date of the petition, within the scope of Question No.

18. During the relevant time frame, Dorsey engaged in the trucking business in Dorsey Trailer

Leasing, Inc., and One Source Transportation, Inc. Dorsey's response to Question No. 18 in the

Statement of Financial Affairs was false and known by him to be false at the time he made the statement.

The following exchange between Dorsey and DePaola took place at the meeting of creditors on October 9, 2009.

> DePaola: Did you have any interest in One Source Transportation?
>
> Dorsey: Yes.
>
> DePaola: What was your percentage ownership interest in that?
>
> Dorsey: 40 percent.
>
> DePaola: And who was the other owner?
>
> Dorsey: Who was the other owner?
>
> DePaola: Or owners.
>
> Dorsey: Vann Carter, V-A-N-N, Carter.
>
> DePaola: Is that the only other owner? He was 60 percent owner?
>
> Dorsey: Yeah. We're getting into a lot of detail here about something I feel is irrelevant. How long do you think this is going to take?

(Pl. Ex. 41, pp. 9-10). The record is replete with nonresponsive and outright false answers. One example will suffice here. On September 3, 2009, Trustee Hamm asked about DTA Trucking.

> Q: Tell me about DTA Trucking.
>
> A It was short lived. It was a business I had three partners in about 2000, I guess it was.

(Pl. Ex. 40, p. 13).

At trial, on February 2, 2011, Trustee DePaola asked again about DTA Trucking.

> Q: In your petition you have indicated that you were an owner of DTA Trucking, Inc. Now, as I understand it, this is a business you owned in 2000 with three partners that was, in quote, short-lived,

unquote. I think that's your term when you gave your 341
testimony. Is that accurate.

A. No.

Q: It is not accurate? Your testimony, or what's not accurate?

A. The assumption that DTA was started in 2000. Also Dave's
Trucking and Leasing was not opened by me.

(Trial Tr. 16-17). At trial, Trustee DePaola confronted Dorsey with a verbatim quote from his

earlier testimony at a meeting of creditors. Dorsey denied his earlier testimony, making

nonresponsive answers. The Trustee asked about DTA and Dorsey responded with testimony

about Dave's Trucking, a separate entity, attempting to confuse the issues. Furthermore, Dorsey

resorted to one of his usual ploys by making nonsensical arguments about assumptions that have

clearly not been made. The exchange set forth in this note is typical of responses made by

Dorsey. That is, he did not simply misstate or prevaricate on one occasion, rather this was a

pattern that repeated itself through hours of testimony.

Dorsey was similarly argumentative and evasive throughout the meetings of creditors, as

well as at trial. Having filed false schedules with the Court, Dorsey compounded his misdeed by

stonewalling the Trustee at the meeting of creditors. Dorsey willfully concealed his business

interests and knowingly and intentionally misrepresented the same in his response to Question

No. 18 of the Statement of Financial Affairs. At trial, Dorsey was evasive and hostile to the

Trustee. (Trial Tr. p. 16- ). To this day, Dorsey still has not disclosed his various business

interests with any degree of candor.

### 6. Personal Property

Dorsey submitted a financial statement supplied to Corporate Billing in which Dorsey

claimed to own personal property of a value of $150,000, in addition to the securities which are

13

referenced in Part I(A)(5) above. (Pl. Ex. 22). When Dorsey filed bankruptcy sixteen months

later, he reported owning personalty of a value of only $1,100, consisting of clothing, watch,

wedding ring, a .22 cal. rifle and the ill-fated boat discussed in detail in Part I(A)(2) above.

At the September 3, 2009 meeting of creditors, Hamm inquired as to whether he had any

household goods. Dorsey responded, "nothing in there that belongs to me." (Pl. Ex. 40, p. 19).

After this obviously false response, Hamm stated as follows:

> Mr. Brunson, why don't you guys sit down and look at these
> schedules real hard? And let's make some corrections of the things
> that I have asked about. I think you may want to do that.

(Pl. Ex. 40, p. 20). It was clear to an experienced Chapter 7 Trustee as early as the first setting of

the meeting of creditors, that Dorsey's schedules were incomplete and that he was testifying

falsely. On January 5, 2010, Dorsey amended his Schedule B and listed household goods with a

value of $1,000. (09-11157, Doc. 52).

On April 20, 2010, Dorsey again amended Schedule B. In that last amended Schedule B,

Dorsey lists no cash, no checking accounts, no household goods, indeed no personal property of

any kind except for a 2008 Child Tax Credit in the amount of $3,000, which he claimed as

exempt on Schedule C. (09-11157, Doc. 66). In this second amendment, Dorsey shows his utter

contempt for the system. Hamm invited Dorsey to come clean, but instead he continued to lie

and stonewall. Transfers of property during the two years prior to the date of the petition should

have been disclosed. See, Question No. 10, Statement of Financial Affairs. (09-11157, Doc. 1).

No transfers were disclosed and no explanation was given for the discrepancy between the

financial statement given to Corporate Billing, Inc. and Dorsey's Schedule Bs. For that matter,

no explanation was given for the discrepancy between the three inconsistent Schedule Bs. (09-

11157, Docs. 1, 52, 66). The Court finds that Dorsey has willfully concealed personal property

14

from the estate, with a value of more than $100,000. This is in addition to the more than $200,000 in financial assets concealed as discussed in Parts I(A)(4) and I(A)(5) above.

## B.  The Fraudulent Transfers

In Counts I and II of the Complaint, DePaola alleges that Dorsey fraudulently conveyed three parcels of real property to his wife, co-defendant Karmen Dorsey.  In Part I(B)(1), the Court will discuss Dorsey's financial condition at the time of the transfers and his intent to defraud.  In Part I(B)(2)(a), the Court will discuss the transfer of the marital residence in Dothan, Alabama.  In Parts I(B)(2)(b) and (c), the Court will discuss the two additional parcels of real property, consisting of residential rental property and commercial property.

### 1.  Financial Condition at the Time of Transfers

In 2000, Dorsey was in business with two individuals named Tommy Andrews and Vann Carter.  The business relationship soured.  On September 24, 2002, Andrews filed suit against Carter and Dorsey in the Circuit Court for Houston County, Alabama, Civil No. CV-2002-690.  Andrews alleged breach of contract, fraud, conversion and conspiracy.  (Pl. Ex. 5).  Ultimately, the Circuit Court entered a default judgment against Dorsey and in favor of Andrews on January 26, 2009.  On February 18, 2009, the Circuit Court entered damages in favor of Andrews and against Dorsey in the amount of $1,164,800.  (Pl. Ex. 7).  Dorsey was aware of Andrews suit at all times relevant to these proceedings.  As a result of Andrews receiving a monetary judgment against Dorsey, Andrews is an unsecured creditor of Dorsey.  Andrews has filed a proof of claim in the underlying bankruptcy matter.  (Pl. Ex. 9).

Moreover, at trial Dorsey testified that it was his belief that Andrews suit did not have merit and that it was not a motivating factor in anything he did.  The Court rejects that contention.  The evidence at trial established that Dorsey was aware of Andrews impending suit

15

and that there had been negotiations to resolve their differences as early as July 2001. (Tr. 44). All three transfers happened after the business relationship soured and negotiations began, immediately before Andrews filed his suit, or during the pendency of the case. For these reasons, the Court finds that Andrews claim against Dorsey motivated the three transfers in question.

### 2. The Transfers

#### a. The Dothan Residence

On July 31, 2000, David and Karmen Dorsey purchased a residence in Dothan, Alabama, for $200,000. (Pl. Ex. 24). On August 28, 2002, Dorsey conveyed the property to Karmen for no consideration. (Pl. Ex. 25). Dorsey was employed on a full time basis at all times from the year 2000 to the date of the petition. Karmen Dorsey was not employed outside the home at the time of the purchase and did not obtain employment until 2009. David and Karmen Dorsey had been married for approximately 8 years at the time the residence was purchased and remain married to this date. Moreover, David and Karmen Dorsey have resided in the Dothan residence at all times since 2000, together with their three minor children. The 2002 conveyance to Karmen was not made pursuant to a separation agreement or an anticipated divorce. After the conveyance, Dorsey continued to reside in the Dothan residence with Karmen and he mortgaged the property, using the proceeds for his business. (Pl. Ex. 55).

#### b. The Residential Rental Property

Dorsey purchased residential real property, located on Summer Rain Terrace in Dothan, Alabama, on June 27, 2003. (Pl. Ex. 56) (Tr. p. 134). On October 23, 2003, Dorsey executed a quitclaim deed, transferring the property from solely in his own name so that it was held jointly with his wife Karmen. (Pl. Ex. 57). On June 30, 2006, Dorsey executed a deed in favor of

16

Karmen Dorsey on the property, transferring it totally out of his own name so that Karmen was the sole owner of the property. (Pl. Ex. 28). No consideration was paid by Karmen Dorsey for either transfer. Dorsey's testimony on his reasons for the transfer was wholly unconvincing. (Tr. pp. 136-139).

### c. The Commercial Property

Dorsey acquired commercial property in Dothan in 2003. On June 30, 2006, Dorsey executed a deed in favor of Karmen Dorsey the commercial property. (Pl. Ex. 32). The conveyance took place on the same day that he transferred the residential rental property described in Part I(B)(2) above. The conveyance also was for no consideration.

## II. LAW

### A. Jurisdiction

This Court has jurisdiction to hear this proceeding pursuant to 11 U.S.C. § 1334(b). Counts I and II, the fraudulent transfer claims, are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H). Count III, seeking turnover pursuant to 11 U.S.C. § 542, and Count IV, seeking to sell property pursuant to 11 U.S.C. § 363, are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). Count V, the Trustee's objection to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(4)(A) and (D), are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(J). This is a final order.

### B. Objection to Discharge

The Trustee objects to Dorsey's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(4)(A) and (a)(4)(D). "A denial of discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objection party." Eastern Diversified Distributors, Inc., v Matus (In re Matus), 303

17

B.R. 660, 671 (Bankr. N.D. Ga. 2004) ( citing Equitable Bank v. Miller (In re Miller), 39 F.3d

301, 304 (11th Cir. 1994)). The objecting party bears the initial burden of establishing grounds

for denial of discharge, which must be proven specifically, "directed at the transfer or

concealment alleged. A debtor should not be denied a discharged on 'general equitable

considerations.'" Id. at 671-72 (quoting Hunerwadel v. Dulock (In re Dulock), 250 B.R. 147,

153 (Bankr. N.D.Ga. 2000) (internal citations omitted). Many courts require the objecting party

to prove their case by a preponderance of the evidence, a standard which this Court also adopts.

See generally id. Once the objecting party meets this initial burden, the burden shifts to the

debtor to adequately explain why he is still entitled to discharge despite the objections. Id.

(internal citations omitted). With this in mind, the Court will consider each ground separately

below.

## 1. False Oaths or Accounts

Section 727(a)(4)(A) provides as follows:

> (a) The court shall grant the debtor a discharge, unless–
>
> * * *
>
> (4) the debtor knowingly and fraudulently, in or in
> connection with the case—
>
> (A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). "The veracity of the bankrupt's statements is essential to the

successful administration of the Bankruptcy Act." Chalik v. Moorefield, 748 F.2d 616, 618 (11th

Cir. 1984) (citing Diorio v. Kreisler-Borg Construction Co., 407 F.2d 1330 (2nd Cir. 1969)). To

justify denial of discharge under § 727(a)(4)(A), the false oath must be both fraudulent and

material. Protos v. Silver, 322 Fed. Appx. 930, 933 (11th Cir. per curiam decision entered

4/13/2009); SwiceGood v. Ginn, 924 F.2d 230, 232 (11th Cir. 1991); see also, Cadle Company v.

18

Pratt (In re Pratt), 411 F.3d 561, 566 (5th Cir. 2005); Matus, 303 B.R. at 675-76; Overly v. Guthrie (In re Guthrie), 265 B.R. 253, 262-63 (Bankr. M.D. Ala. 2001). Fraudulent intent can be inferred by a pattern of multiple non-disclosures and improper disclosures. Protos, 322 Fed. Appx. at 933.

Materiality of a statement is determined if the matter is "pertinent to the discovery of assets, including the history of a bankrupt's financial transactions." Chalik, 748 F.2d at 618. Furthermore, a false oath can be demonstrated to be material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Id.

Dorsey made a considerable number of false statements, any one of which is sufficient to deny discharge. The cumulative effect of Dorsey's false statements overcomes any claim that the statements were in error. Moreover, the statements and omissions were material because they affected the Trustee's ability to discover all of Dorsey's assets and administer the case.

The first four false statements relate to the ill-fated boat. To begin, Dorsey swore, under oath, that he owned a boat worth $6,000 and that he owed Teddy Vaughan $12,000, which was secured by the boat. The first false statement was in Schedule D. Dorsey's second false statement was made during the September 3, 2009 meeting of creditors which was conducted by Trustee Hamm. Dorsey's second false statement was made to Hamm concerning Vaughan's security interest, which did not exist. To further compound this error, Dorsey stood by in silence while his lawyer misrepresented the existence of a UCC-1 statement, which Dorsey knew did not exist. Either Dorsey and Brunson conspired with one another to make false statements to the Trustee, supporting one another, or Dorsey misled Brunson who repeated Dorsey's false statement. Dorsey's third false statement was made on October 9, 2009, when Trustee DePaola

19

followed up and Dorsey again stated falsely that there were documents.  One might quibble as to whether Dorsey made one or two false statements to DePaola when he swore that there were documents and that he would get copies.  Dorsey knew that there were no such documents and Dorsey had no intention of obtaining copies of these nonexistent documents.  Nevertheless, the Court will count this as just one misstatement on October 9, 2009, bringing the total to three.

The fourth misstatement was made a trial when DePaola asked Dorsey at trial about the documents and why he had not produced any.  Dorsey replied that because Teddy Vaughan was trying to buy the boat he did not think he had to produce documents. This statement was clearly false as Dorsey knew that the Trustees were attempting to ascertain the existence of Vaughan's security interest from the beginning.  Thus, DePaola proved at least four material misstatements from Dorsey concerning the boat and the nonexistent security interest in favor of Teddy Vaughan.

The fifth false statement was made by Dorsey when he failed to disclose all his bank accounts and his repeated failure to accurately report the balance in those accounts.  See supra Part I(A)(4).  A knowing and fraudulent omission from a sworn Statement of Financial Affairs or Schedule may constitute a false oath.  Chalik, at 618 , n. 3 (citing Farmers Co-Operative Association v. Strunk, 671 F.2d 391, 395 (11th Cir. 1982)). This false statement allowed Dorsey to hide cash from the Trustee, which should have gone to creditors.

A sixth false statement was made by Dorsey when he answered "None" in response to Question No. 18 about business interests on the Statement of Financial Affairs.  See supra Part I(A)(5).  In fact, Dorsey owned several businesses, or partial interests in businesses which were not disclosed.  If one looks closely at the Statement of Financial Affairs, one will see that if Question No. 18 is answered "none" then it is not necessary to answer Question No. 19, which

calls for the and address of bookkeepers and accountants. Therefore, by falsely answering Question 18, no answer for Question No. 19 was necessary, further thwarting the Trustee's efforts to obtain information. The false statement made in answer to Question No. 18 was material and it harmed the estate.

Dorsey made repeated false statements concerning personal property. In his original Schedules he claimed that he did not own any household goods. One January 5, 2010, Dorsey amended his schedules, disclosing household goods valued at $1,000. Dorsey did not explain the discrepancy between his financial statement provided to a creditor showing personal property of $150,000 and household goods of only $1,000. To further muddy the waters, on April 20, 2010, Dorsey again amended his Schedules, again reflecting that he owned no household goods. All of these statements were false and they were designed to thwart the Trustee's efforts in learning the true state of Dorsey's property interests.

The evidence offered by DePaola showed many false statements which were made fraudulently and intentionally. The burden shifted to Dorsey to explain these false statements to the Court. As of the date of his trial, he has not explained the reasons behind these misstatements to the Court's satisfaction to save him from a denial of discharge. To deny a discharge, only one instance need be shown. DePaola has proved her case, pursuant to § 727(a)(4)(A), a half-dozen times or more.

## 2. Concealed Financial and Recorded Information

Both §§ 727 (a)(4)(d) and (a)(3) deal with a debtor's recorded information required to be disclosed during the course of the bankruptcy. Section 727(a)(3) allows for denial of discharge if:

> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books,

> documents, records, and papers, from which the debtor's financial
> condition or business transactions might be ascertained, unless
> such act or failure to act was justified under all of the
> circumstances of the case[.]

11 U.S.C. § 727(a)(3).  While the law generally favors discharge, "it will not ordinarily tolerate

the [debtor's] intentional departure from ordinary honest business practices where there is a

reasonable likelihood of prejudice."  In re Moore, 2010 WL 1880573, *6 (citing 6 COLLIER ON

BANKRUPTCY ¶ 727.01[4] (15th ed. rev.2008)).  Under § 727(a)(3), to establish a prima facie

case, the moving party must demonstrate that (1) the debtor committed an act of destruction,

mutilation, falsification, or concealment of any recorded information and, (2) as a result of the

act, it is impossible to determine the financial condition and material business transactions of the

debtor.  Id. (referencing 11 U.S.C. § 727(a)(3); Buckeye Retirement Co., L.L.C. v. Howells (In

re Howells), 365 B.R. 764, 768 (Bankr.N.D.Ohio 2007)).

> Under § 727(a)(4)(D) the Court may deny a debtor discharge if it finds that:

>> (4) the debtor knowingly and fraudulently, in or in connection with
>> the case –

>> (D) withheld from an officer of the estate entitled to possession
>> under this title, any recorded information, including books,
>> documents, records, and papers, relating to the debtor's property or
>> financial affairs[.]

11 U.S.C. § 727 (a)(4)(D).  Susan DePoala, as the Trustee in this case, is undisputedly an "officer

of the estate" as under Chapter 3 of Title 11 of the Bankruptcy Code, the position of the "trustee"

is defined under subchapter 11 – "Officers."  Moreover, § 323 defines the role and capacity of the

trustee as "(a) The trustee in a case under this title is the representative of the estate.  (b) The

trustee in a case under this title has capacity to sue and be sued."  11 U.S.C. § 323.  Therefore,

DePoala, as the Trustee has standing to bring this § 727(a)(4)(D) complaint.

In order for the Trustee to be successful in proving a violation under § 727(a)(4)(D), the Trustee must show that she actively requested the documents to meet the "knowingly and fraudulently" intent requirement. See id. at 680; Jeffrey M. Goldberg & Assoc. v. Holstein (In re Holstein), 272 B.R. 463, 479 (Bankr. N.D.Ill. 2001).

The Trustee has proven both of the elements under § 727(a)(3) and § 727(a)(4)(D). Dorsey concealed the true nature of the amount in his bank accounts and his IRA. Despite numerous requests by the Trustee for documentation and statements regarding the substantive nature of Dorsey's IRA, to date Dorsey has failed to provide that information. In addition, Dorsey and his attorney reported to the Trustee that there was a UCC-1 detailing a security interest in a boat. However, both parties maintained the existence of the UCC-1, but never provided the documentation, even after the Trustee requested proof of the UCC-1's existence at both the Meeting of Creditors and through written communication. It appears that the UCC-1 does not exist, but due to the concealment of the true facts relating to the UCC-1, this is also a knowing and fraudulent concealment of information that is material and relevant to the underlying bankruptcy case. All three of these instances made it impossible for the Trustee to determine the true state of Dorsey's financial condition and business transactions. Therefore, this Court finds that Dorsey concealed recorded information despite numerous requests for the information such that made it impossible to assess the financial condition of his estate in violation of §§ 727(a)(3) and (a)(4)(D) and this further supports denial of discharge.

### 3. Fraudulent Activities under § 727(a)(2)

The Trustee also seeks to deny Dorsey's discharge under § 727(a)(2) for Dorsey's actions during the pendency of the case. Section 727(a)(2)(B) states:

(a) The court shall grant the debtor a discharge, unless –

23

*** 

         (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed

*** 

         (B) property of the estate, after the date of the filing of the petition[.]

Section 727(a)(2)(B) thus requires that the objecting party, here the Trustee, prove that the debtor (i) transferred or concealed his property or property of the estate; (ii) actual fraudulent intent; and (iii) the act occurred postpetition. Matus, 303 B.R. at 672. Moreover, "[a] single wrongful act or omission may be sufficient to prove actual intent; however, evidence of a pattern of wrongful behavior presents a stronger case." Id. (citing Royer v. Smith (In re Smith), 278 B.R. 253,258 (Bankr. M.D.Ga. 2001) (internal citation omitted)).

    Section 727(a)(2)(B) requires "actual intent" of fraudulent activity and both rely on commonly considered "badges of fraud" that a trier of fact may consider in determining intent. In re Matus, 303 B.R. at 672-73. Those "badges of fraud" include:

    1.    Whether the transfer was to an insider, such as a family member or close friend;

    2.    The retention of possession, control, benefit, or use of the property by the debtor;

    3.    The secrecy of the transfer;

    4.    Whether the transfer was made after the debtor was sued, threatened with a suit; incurred substantial debt, or met with financial hardship;

    5.    Did the transfer include all or a substantial portion of the debtor's property;

    6.    The lack of adequate compensation that is reasonably equivalent to the value of the property;

24

7.      The financial condition of the party charged prior to and after the transaction – was the party insolvent prior to the transfer or did the party become insolvent as a result of the transfer?

Id.   With these "badges of fraud" laid out, the Court now turns its attention to the facts surrounding this bankruptcy proceeding to determine if the Trustee has proven a violation of § 727(a)(2)(B).

Addressing the issue of the boat first, Dorsey disclosed his ownership of a boat, but concealed the whereabouts of the boat during the pendency of the case.  See supra (I)(A)(2).   The location of the boat was not listed on Dorsey's Schedule B.   When the Trustee requested that either the security interest in the boat be provided or the boat delivered to the Trustee's possession, Dorsey repeatedly failed to provide either.   Moreover, during the postpetition concealment of the boat's location, the boat was vandalized, with the removed items depressing the value of the boat at auction.   Id.   This all caused a detriment to the estate and occurred postpetition.

While Dorsey practically admits to concealing the boat from the Trustee, (Tr. p. 173-74), proving actual fraudulent intent, there are also several "badges of fraud" present, supporting a finding of actual fraudulent intent.   First, the purported secured creditor of the boat, Teddy Vaughan, is a lifelong friend of Dorsey.   It is for Mr. Vaughan that Dorsey concealed the boat because Dorsey's concealment drove down the price allowing Mr. Vaughan to purchase the boat a significantly discounted price from the Trustee.  Supra (I)(A)(2).   Dorsey also retained possession of the boat during the pendency of the case.   Moreover, Dorsey's concealment of the boat and permitted mutilation of the boat was repetitious, with Dorsey refusing to provide the boat even after several requests by the Trustee.   Dorsey's conduct with regards to the boat

mirrors several "badges of fraud" and therefore, demonstrates his actual fraudulent intent under §
727(a)(2)(B).

In addition to the concealed boat, Dorsey concealed other property from the Trustee.
Dorsey did not reveal the true amount in his banking accounts. In addition, he was illusive about
the location and make-up of his IRA and repeatedly failed to provide requested documentation
on the IRA. He was equally deceptive with his responses regarding his business interests in
various enterprises. Finally, he continued this pattern of hiding the extent of his property with
regards to his personal property – his Schedule B was severely incomplete in its listing of
household goods and other personal items. While any one of these instances might suggest
Dorsey's actual intent to defraud his creditors and hide property from the Trustee, there is a clear
pattern of deceit and each instance involves some of the "badges of fraud." Dorsey has not
provided an adequate explanation for why he continuously made statements and acted in a
manner that concealed property of the estate from the Trustee post-petition. Thus, the Trustee
has met her burden to demonstrate a violation of § 727(a)(2)(B).

## C. Fraudulent Transfers

The Trustee seeks to have the three transfers discussed in Part (I)(B) voided as fraudulent
under Ala. Code §§ 8-9A-4 and 8-9A-5. These state remedies are available to the Trustee under
11 U.S.C. § 544(b), which states, in part:

> . . . the trustee may avoid any transfer of an interest of the debtor in
> a property or any obligation incurred by the debtor that is voidable
> under applicable law by a creditor holding an unsecured claim that
> is allowable under section 502 of this title or that is not allowable
> only under section 502(e) of this title.

The Court will first discuss the fraudulent transfer provision when actual fraud is present and
then proceed with the constructive fraud provision.

## 1. Ala. Code § 8-9A-4 – "Actual Fraud" Fraudulent Transfer

Under Ala. Code § 8-9A-4, made applicable through the Bankruptcy Code 11 U.S.C. § 544(b),

> [a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

The "actual intent" standard is the same as § 727(a)(2)(B)'s actual intent standard and the courts rely on the same "badges of fraud" to determine the intent of the debtor. See Ala. Code § 8-9A-4; Parsons & Whittmore Enterprises Corp. v. Cello Energy, LLC, 2011 U.S. Dist. LEXIS 10840, *39 (S.D. Ala. Feb. 3, 2011). "While a single bade of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis to infer fraud[.]" Parsons, 2011 U.S. Dist. LEXIS 10840, *42.

The Trustee has demonstrated not just one single "badge of fraud," but has presented facts demonstrating the presence of several "badges of fraud." Taking the badges as listed in order, supra Part (II)(B)(3), first – each of the three parcels were transferred by Dorsey to his wife Karmen Dorsey, a family member, and thus, an insider. Second, Dorsey remained married to his wife, continued to reside in the marital residence in Dothan, Alabama, and even mortgaged the marital residence to pay his business debts. Moreover, as to the residential rental property and the commercial property, there is no evidence to suggest that Dorsey gave up control or possession of these properties following the transfer to his wife. The third badge is neutral because aside from not listing the transfers on his petition, there is no evidence suggesting secrecy at the time of the transfers. Fourth, one month after Dorsey conveyed the marital residence to his wife, he was sued by his former business partners. The other two properties

27

were obtained after the suit, but transferred out of Dorsey's name and into his wife's name prior to the final determination of that lawsuit. Fifth, when looking at Dorsey's Schedule A – he lists two additional real properties, both of which lack equity. Therefore, it appears that by transferring these three properties out of his name, Dorsey transferred substantially all his property that had any equity to be used to pay creditors.

Sixth, Dorsey received no reasonably equivalent compensation for the transfers. There was some testimony that one of the transfers was because Mrs. Dorsey's mother had paid-off the mortgage, but the property was not transferred to Mrs. Dorsey's mother. Seventh, Dorsey transferred what appears to be the only three assets that had any equity in them. Moreover, due to the pendency of the lawsuit, and subsequent judgment, the entire picture makes Dorsey appear insolvent.

The Trustee has shown not just one or two badges of fraud with regards to these three transfers, but all seven "badge of fraud" listed above. Looking at the entire picture, it is evident that the Trustee has demonstrated that Dorsey had the actual intent to "hinder, delay, [and] defraud" his creditors by transferring these properties to his wife.

### 2. Constructive Fraud – Ala. Code § 8-9A-5

This Court has found actual fraud with regards to the fraudulent transfers discussed <u>supra</u>, but because the Trustee has brought a claim under Ala. Code 8-9A-5, the Court will briefly discuss the matter. Section 8-9A-5 says that a constructive fraudulent transfer occurs when: (1) the debtor transfers their interest in property; (2) for less than a reasonably equivalent value; and (3) the debtor was insolvent on the date of the transfer. Ala. Code § 8-9A-5; <u>Alexander v. J. Martin & Assc., et al. (In re Terry Manufacturing)</u>, 363 B.R. 233, 236 (Bankr. M.D.Ala. 2007).

28

Alabama courts have regularly held that "[c]ourts are to *automatically* infer constructive fraud if the transfer was made to a family member and there was no valuable consideration." Mixon v. Robinson (In re Robinson), 2008 WL 1756357, *2 (Bankr. S.D.Ala. Apr. 14, 2008); Peoples v. AuburnBank, 814 So.2d 297, 300 (Ala. Civ. App. 2001); McPherson Oil Co., Inc. v. Massey, 643 So.2d 595, 596 (Ala. 1994) (emphasis added). Here, it has already been established that all three transfers were from Dorsey to his wife, a family member. Second, the transfers all lacked any sort of valuable consideration. Therefore, without even having to further discuss the issue of insolvency, it is evident that these three transfers also were fraudulent conveyances under Alabama's constructive fraudulent transfer provisions.

## III. CONCLUSION

Upon reviewing the facts of the case and examining the applicable law, this Court finds that the Trustee, Susan DePaola has met her burden under the requirements of 11 U.S.C. §§ 727(a)(2), (3), and (4) to deny the Debtor, David M. Dorsey, discharge. Dorsey repeatedly made false statements and accounts; omitted, hid or concealed material financial information or property of the estate; and acted with an intent to hinder, delay, and defraud the trustee and creditors in this case. Therefore, a denial of discharge is proper under all three provisions of § 727(a) which the Trustee has brought her complaints.

Second, the Trustee has proven that Dorsey's three property transfers to his wife in the six years preceding this case were done with the actual intent to hinder, delay, and defraud his creditors under Ala. Code § 8-9A-4. Moreover, the facts prove constructive fraud under Ala. Code § 8-9A-5 in regards to these transfers. As such, these transfers being fraudulent are avoided as allowed under 11 U.S.C. § 544(b).

29

The Court finds that all remaining property, including the property of the three voided transfers, be turned over to the Trustee for sale pursuant 11 U.S.C. §§ 542 and 363(h).

The Court will enter an order to this effect by way of a separate document.

Done this 8th day of June, 2011.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: Susan S. DePaola, Plaintiff
   Charles Matthew Brunson, Attorney for Defendant David Dorsey
   Anne S. Sumblin, Attorney for Defendant Karmen Dorsey

30